UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

REGINALD L. JANNSON,                                    CIVIL NO. 13-104 (MJD/TNL)

PLAINTIFF,

V.                                                      REPORT AND RECOMMENDATION

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

DEFENDANT.

---

Gary A. Ficek, Attorney at Law, 15 Broadway Ste. 301, Fargo, ND 58102 for Plaintiff; and

Ana H. Voss, Assistant United States Attorney, 600 United States Courthouse, 300 S. 4th Street, Minneapolis, Minnesota  55415, for Defendant.

## I.   INTRODUCTION

Plaintiff Reginald L. Jannson brings the present action, disputing Defendant Commissioner of Social Security's denial of his application for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the parties' cross motions for summary judgment. For the reasons set forth herein, this Court will recommend Plaintiff's Motion for Summary Judgment (ECF No. 11) be denied, the Commissioner's Motion for Summary Judgment (ECF No. 13) be granted, and this matter be dismissed with prejudice.

## II.   FACTS

### A. Procedural History

Jannson filed for DIB and SSI on February 3, 2010, alleging disability beginning March 28, 2008, due to chronic knee pain and affective/mood disorders. (R. 78.) Jannson's claim was denied initially (R. 78-81) and on reconsideration. (R. 82-85.) On October 19, 2011, Plaintiff, with counsel, had a hearing before ALJ Eskunder Boyd. (R. 36-75.)

In his November 14, 2011 opinion (R. 16-35), the ALJ concluded as follows: Jannson has not engaged in substantial gainful activity since March 28, 2008. (R. 21.) Jannson suffered from a left meniscal tear, disc protrusion at L5-S1 with lower back pain and radiculitis to both legs, diabetes mellitus, hypertension, obesity, depression and anxiety disorder, and personality disorder with history of aggressive behavior. (R. 21.) Jannson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 21.) Jannson had the residual capacity to

> perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except [Jannson] can only occasionally use his legs for operating foot controls. He can never climb ladders/ropes/scaffolds and can occasionally climb ramps and stairs. [Jannson] can occasionally balance and crouch and can frequently stoop, kneel, or crawl. [Jannson] cannot work around hazards or machinery. [Jannson] requires a sit/stand option to sit for 30 minutes before arising/shifting positions. [Jannson] is limited to performing simple and detailed, but not complex tasks. He can maintain sufficient concentration, pace, and persistence for 2-4 hours. [Jannson] is limited to brief and superficial contact with co-workers or the public.

(R. 23.) Jannson was unable to perform any past relevant work, but considering his age, education, work experience, and residual functional capacity, Plaintiff could perform all or substantially all of the requirements of unskilled sedentary occupations such as eyeglass assembler, lens inserter, and stuffer. (R. 27-28.) These are all jobs that exist in significant numbers in the national economy. (R. 27-28.) The ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act since March 28, 2008. (R. 28.)

Jannson requested review of the ALJ's decision, and the Appeals Council denied the request. (R. 1-5.)

### B. Employment Background

Jannson worked as a forklift operator from August 1993 to October 1998. (R. 286.) Jannson then worked as a fast food cook from February 1999 to October 1999. (R. 286.) From November 2000 to March 2008, Jannson worked intermittently as a temporary laborer. (R. 286.) From April 2004 to April 2006, Jannson worked in a pizza maker factory. (R. 286.)

### C. Medical Records

On October 8, 2007, Jannson injured his left knee in a fall while he was working at Top Taste in Finley, North Dakota. (R. 299, 301.) Numerous x-rays were taken of his hip, pelvis and knee; the treating physicians noted no abnormalities. (R. 299.) At his follow-up appointment, Jannson was diagnosed with a left knee sprain. (R. 299-300.) The treating physician ordered Jannson not to put any weight on his left leg, to use crutches to

ambulate, to take vicodin as needed for the pain, and to be fitted with a knee immobilizer. (R. 300.)

Jannson returned to the doctor on October 11, 2007, to reevaluate his left knee. (R. 294-95, 297.) He rated his pain an 8 out of 10 and reported using crutches 100% of the time. (R. 294, 297.) The treating physician was unable to perform a McMurray's test because Jannson's injured leg would neither straighten nor bend. (R. 297.) Jannson was told to continue using his crutches and his knee immobilizer; to limit his lifting, pushing and pulling to 5 pounds; to sit 75% of the time; not to climb stairs or ladders; and not to kneel or squat. (R. 297-98.)

Jannson returned to the emergency room on October 19, 2007, complaining that his knee "gave out" and he reinjured it. (R. 325.) The treating physician noted that Jannson's patella was tender, but he could not tell whether there was a joint effusion and detected no gross instability. (R. 325.) Medial and lateral cruciate testing seemed grossly stable, and Jannson's patella seemed to tract normally. (R. 325.) The treating physician opined that it was possible that Jannson could have had a meniscus injury or joint mouse from the initial injury on October 8. (R. 326.)

Jannson revisited the doctor on October 22, 2007. (R. 296.) At this visit, he rated his pain a 7 out of 10. (R. 296.) His physician noted difficulty performing a full examination of Jannson's knee because of the size of his legs. (R. 296.) Jannson was re-issued the same work restrictions and told to follow up in 7 to 10 days. (R. 296.)

Jannson visited the doctor again on November 5, 2007. (R. 294-95.) At this visit, he rated his pain an 8 out of 10. (R. 294.) Jannson's physician set an appointment for

4

Jannson to be reevaluated by orthopedic surgery. (R. 294.) Overall, the treating physician noted no changes since Jannson's previous visit. (R. 294.)

On February 19, 2008, Dr. Michael B. Simpson examined Jannson at MeritCare Clinic Southpointe Orthopaedics ("Southpointe"). (R. 328-29.) Jannson rated his pain at a 6 or 7. (R. 330.) Dr. Simpson noted that Jannson could hold his left leg in an extended position but that he had some gradual weakness that appeared to be more of a fade than a give way. (R. 328.) His left knee had increased patellar mobility when compared to his right, and some mild medial joint line tenderness. (R. 328.) A CT scan revealed some soft tissue swelling but no acute bony abnormality. (R. 328.)

Jannson followed up at Southpointe on April 1, 2008, after undergoing electromyograms and an MRI. (R. 331.) At this visit, he rated his pain a 7 out of 10. (R. 375.) The examining physician noted fibrillation potentials in Jannson's bilateral gastroc-soleus muscles and chronic neurogenic motor unit potential changes in his distal lower extremity muscles. (R. 333.) There appeared some abnormalities, but no evidence of a definite left femoral neuropathy or left L4 radiculopathy. (R. 333.) His MRI revealed a possible lateral meniscal tear. (R. 331.)

Jannson returned to the doctor on April 18, 2008. (R. 292.) Examination of his knees revealed flexion to a full 135 degrees and hyperextension of 10 degrees, but no loss of recurvatum and no deformities of his knees. (R. 292.) At this appointment, Jannson was able to weightbear for more than 4 steps bilaterally without pain. (R. 292.) Jannson returned to the doctor on May 13, 2008. (R. 334-337.) He rated his pain at 8 or 9 out of

10. (R. 334.) He was taking Vicodin as needed for pain, but he was not doing any physical therapy. (R. 334.)

Jannson was diagnosed with diabetes on July 17, 2009. (R. 425.) On July 28, 2009, Jannson was admitted to Prairie St. John's to treat depression and suicidal ideation that had persisted for a few months. (R. 431, 440.) During his stay at Prairie St. John's, his sleep improved and he was eating well and feeling better. (R. 432.) He was discharged on August 4, 2009. (R. 432.) Jannson had a follow-up appointment for his depression on October 28, 2009. (R. 446.) He presented as alert and orientated, he asked appropriate questions and answered appropriately. (R. 446.) He denied any thoughts of harming himself or others, but stated that he occasionally has had thoughts of harming himself. (R. 446.)

In late 2009, Jannson began seeing psychologist Ronald Odden at Lakeland Mental Health Center. (R. 475, 485.) He saw Odden on a regular basis over the next few years. (R. 457-86, 529-47, 553-62.) Jannson occasionally discussed instances where he became upset or angry with another person (*e.g.*, R. 465, 467, 483, 534, 538, 542, 544, 553, 555, 557) and often addressed feelings of depression and sadness (*e.g.*, 457, 459, 463, 469, 471, 473, 530, 555, 557, 561). At one session in April 2010, he was upset because he had prepared a meal for 30 people at the Social Connection for Easter Sunday and no one had thanked him or helped him clean up. (R. 542.)

On October 28, 2009, Jannson reported to his physician that he had been able to lose 50 pounds from working out at the gym. (R. 446.) Jannson also traveled to Chicago by train—a trip lasting around 12 or 13 hours—several times in the spring and summer of

6

2010 to visit family (*see* R. 53, 432, 437, 439) and to Florida by plane in June 2011 for a family reunion (*see* R. 746, 748).

Jannson was evaluated by Dr. Carol C. Follingstad at Integrating Counseling Services on July 12, 2010, due to problems with depression, anxiety, obesity, anger issues, and diabetes. (R. 487.) At this evaluation, Jannson reported being interested in playing pool, throwing darts and cooking, but not going out of the house unless he has a doctor's appointment. (R. 488.) He reported that he had problems interacting with people because of his irritability. (R. 488.) He also reported that he goes on the internet, watches television, and reads the newspaper every day. (R. 489.) Dr. Follingstad determined that Jannson "demonstrated good abstract reasoning, judgment, and background knowledge . . . . Long-term, short-term and immediate recall appear[ed] to be good." (R. 489.) Dr. Follingstand opined that Jannson "show[ed] the ability to understand simple and complex instructions," but because of his then-current symptoms of "depression and anxiety, [Jannson] will need support and extra time in any work or social situation." (R. 491.) Dr. Follingstad also opined that Jannson's history of aggressive behavior "should be taken into account when considering employment and social issues." (R. 491.)

Dr. Mark Yohe evaluated Jannson for asserted disability on July 13, 2010. (R. 492-99.) At this evaluation, Jannson rated his pain an 8 out of 10 and stated that it had been present for over 6 months. (R. 493.) Dr. Yohe did not believe there to be any ligamentous injury to Jannson's left knee, but found examining Jannson difficult because of his size. (R. 494.) Dr. Yohe's notes, however, are internally inconsistent; his notes provide that Jannson's range of motion was limited and he could not bend further than

some degrees because of his body size, but his examination diagrams show that Jannson could bend 90 degrees at the waist. (R. 494, 499.) Dr. Yohe recommended that Jannson not work around heights or dangerous machinery, but opined that he could operate hand controls. (R. 494.)

Jannson was seen at Sanford Occupational Health Center on December 15, 2010, complaining that he injured his back when bending over to lift a pallet at work. (R. 614.) He was bent over lifting a pallet and experienced acute onset of lower back pain and numbness in his right leg. (R. 614.) Jannson was prescribed physical therapy and pain medication. (R. 615.) At a follow-up visit on December 22, 2010, Dr. John Beauclair opined that Jannson needed to be able to lay down 6 hours out of an 8-hour day. (R. 609.) At another follow-up visit on December 29, 2010, John Mickelson, D.O., opined that Jannson did not need to be laying down at work; his then-current work restrictions were no lifting over 10 pounds, no bending over 10 times per hour, no pushing or pulling over 10 pounds of force; and he should be sitting down 60% of the time and indoors 60% of his shift. (R. 603.)

Jannson was seen at Family HealthCare Center in Fargo, North Dakota, for a diabetic recheck on January 24, 2011. (R. 572.) He disagreed with the notion that his weight might contribute to the pain that he reported in his back, hip and knee. (R. 572.) He denied any side effects from his medications and stated that he had no trouble sleeping, no mood swings, and no signs of depression. (R. 572, 575.) Jannson returned to Family HealthCare Center on August 18, 2011. (R. 715.) He reported feeling depressed

recently, but denied any side effects from his medications and reported no trouble sleeping. (R. 717.)

### D. Residual Functional Capacity Assessments

#### 1. Physical RFC Assessments

On September 17, 2008, Dr. Ernst Bone assessed Jannson's physical residual functional capacity. (R. 351-58.) Dr. Bone opined that Jannson could occasionally lift 20 pounds, frequently lift 10 pounds, and stand and/or walk about 6 hours in an 8-hour work day. (R. 352.) Dr. Bone also opined that Jannson could occasionally climb ramps, stairs, ladders, rope and scaffolds, occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. (R. 353.) Although Jannson did not submit a description of his daily activities, Dr. Bone noted that the daily activities mentioned throughout the evidence supported the above limitations. (R. 358.)

On August 11, 2010, Dr. Charles T. Grant reviewed Jannson's medical records and assessed his physical residual functional capacity. (R. 521-29.) Dr. Grant opined that Jannson could occasionally lift 20 pounds and frequently lift 10 pounds, and that Jannson could stand and/or walk for at least 2 hours in an 8-hour work day. (R. 522.) Dr. Grant also opined that Jannson could occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance and crouch; and frequently stoop, kneel and crawl. (R. 523.) Dr. Grant found Jannson's allegations to be "partially credible" and noted that his "described functional limitations [were] somewhat disproportionate to [the] objective findings." (R. 523.)

## 2.     Mental RFC Assessments

On August 7, 2010, state agency psychologist K. Lovko performed a mental residual functional capacity assessment of Jannson. (R. 517-520.) Lovko opined that Jannson was moderately limited with respect to (1) his ability to carry out detailed instructions; (2) his ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) his ability to interact appropriately with the general public; (4) his ability to accept instructions and respond appropriately to criticism from supervisors; and (5) his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 514-15.) Lovko opined that Jannson was not significantly limited in any other respect. (R. 514-15.) Lovko determined that Jannson was "partially credible" because his record "does not support the presence of limitations severe enough to prevent employment in all work environments" and that he "is able to perform a wide range of activities." (R. 516.) Lovko concluded as follows:

> The evidence suggests that [Jannson] can understand, remember, and carry-out simple tasks without special considerations in many work environments. [Jannson] can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. [Jannson] can attend to task for sufficient periods of time to complete tasks. [Jannson] can manage the stresses involved with simple work.

(R. 516.)

On October 17, 2011, Odden assessed Jannson's mental residual functional capacity. (R. 765-70.) He opined that Jannson is moderately limited with respect to:

(1) his ability to understand and remember detailed instructions; (2) his ability to carry out detailed instructions; (3) his ability to maintain attention and concentration for extended periods; (4) his ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) his ability to respond appropriately to changes in the work setting. (R. 767-68.) Odden opined that Jannson is markedly limited with respect to: (1) his ability to work in coordination with or proximity to others without being distracted by them; and (2) his ability to accept instructions and respond appropriately to criticism from supervisors. (R. 767-68.)  Odden opined that Jannson is not significantly limited in all other areas. (R. 767-68.) Odden elaborated on his assessment of Jannson as follows:

> Mr. Jannson would experience a moderate level of difficulty with understanding and remembering instructions of a detailed nature at times his mood is low or he has increased physical pain. At times carrying out detailed instructions would be moderately impaired and concentration moderately impaired by Mr. Jannson's mood or when he is irritable/angry with others. Working in close proximity with others would cause some problems for Mr. Jannson, as he is inclined to be easily annoyed and impatient with others and if others gave him any negative feedback he would react by leaving the job situation[,] become angry and threatening toward others. A typical work week would not be fully completed by Mr. Jannson without some episodes of irritability or anger with others. [Mr. Jannson] would not accept critical feedback from others well. Changes in routine or the way tasks are completed would be met with some animosity by Mr. Jennson unless it was his idea.

(R. 769.) Odden also completed a psychiatric review form and opined that Jannson suffers from a depressive syndrome and possesses inflexible and maladaptive personality traits. (R. 771-84.)

### E.  Administrative Hearing

A hearing before an Administrative Law Judge ("ALJ") occurred on October 19, 2011. (R. 38-74.) Jannson testified about his conditions as follows: In the last couple of years, his weight had increased from about 355 to 425 pounds. (R. 47.) Occasionally he would go to the Social Connection, a place that assists people with mental illness. (R. 48-49.) He uses his phone to access the internet and Facebook. (R. 49.) He could lift a gallon of milk and set it on the counter, but he was unable to lift 10 pounds. (R. 52.) He could only sit for about 30 minutes at a time and stand for about 15 minutes at a time because of numbness and throbbing in his legs. (R. 52.) He testified that he was in continuous pain, rating it at 9 or 9.5 out of 10. (R. 56, 58.) Over a normal eight-hour work shift, Jannson stated that he would be laying down about six hours. (R. 61-62.) He could walk about a half a block before having to stop. (R. 62-63.)

Warren Haagenson testified as a vocational expert. (R. 65-73.) The ALJ presented Haagenson with several hypothetical individuals, each with limitations similar to those testified to by Jannson. (R. 66-69.) The first hypothetical assumed an individual of Jannson's age, education and work experience who is "limited to performing light work with occasional climbing of stairs and ramps, never climbing ladders, ropes, scaffolds, never bending [at the waist], . . . can occasionally balance or crouch, could frequently stoop and kneel, with no visual or manipulative limitations, but no work around hazards

or machinery." (R. 66.) It further assumed "that the individual's limited to performing simple and detailed, but not complex tasks, can maintain concentration, pace, and persistence for two to four hours at a time, and could only have occasional interaction with the public and co-workers." (R. 66.) Haagenson testified that an individual with those limitations could perform work as an eyeglass-frame assembler, an eyeglass-lens inserter, or a stuffer. (R. 67.) Haagenson also testified that a significant number of those jobs existed in the national economy and in the state of Minnesota. (R. 68.)

The ALJ's second hypothetical assumed an individual limited to light work, with only occasional use of his legs to operate foot controls; who could never climb ladders, ropes or scaffolds; who could occasionally climb ramps or stairs; who could never bend at the waist forward while standing; who could occasionally crouch, frequently stoop, kneel, or crawl; with no manipulative or visual limitations; who could not work around hazards or machinery; and who was limited to performing simple to detailed tasks. (R. 68.) Haagenson opined that such an individual could perform the same jobs he had previously identified. (R. 68.)

The ALJ's third hypothetical assumed the same limitations as the second hypothetical, with the following additional limitations: could have only brief and superficial interaction with the public and co-workers; and could not deal with criticisms from supervisors. (R. 69.) Haagenson testified that such an individual would be unable to maintain employment. (R. 69.)

The ALJ's fourth hypothetical assumed an individual with the following restrictions: limited to light work; only occasional use of legs to operate foot controls;

never climbing ropes and scaffolds; occasionally climbing ramps and stairs; never bending at the waist while standing; occasionally balancing and crouching; frequently stooping; kneeling, or crawling; no work around hazards or machinery; brief and superficial contact with the public and co-workers; and requires a sit/stand option to sit for no more than 30 minutes at a time before he has to rise and shift for no more than 5 minutes before returning to a seated position. (R. 69-70.) Haagenson testified that an individual with those limitations could not perform any jobs in the national economy. (R. 70.) Haagenson also testified that if the restriction on bending while standing were removed, then such an individual would be able to perform the jobs he had previously identified. (R. 70-71.)

When cross-examined by Jannson's attorney, Haagenson testified that an individual with a restriction requiring extra time in any work situation would not be able to maintain competitive employment. (R. 72)

### F.  ALJ's Decision

On November 14, 2011, the ALJ issued a decision denying Plaintiff's claim. (R. 16.) In his decision, the ALJ found as follows: Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (R. 21.) Plaintiff had not engaged in substantial gainful activity since March 28, 2008. (R. 21.) Plaintiff has the following severe impairments: left meniscal tear, disc protrusion at L5-S1 with low back pain and radiculitis to both legs, diabetes mellitus, hypertension, obesity, depression and anxiety disorder, and personality disorder with a history of aggressive behavior. (R. 21.)

14

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22.) With respect to Jannson's physical symptoms, the ALJ noted that "the [medical] record does not demonstrate motor loss (atrophy with associated muscle weakness or muscle weakness)," Jannson's muscle strength testing was "fine," and Jannson "was noted to have normal deep tendon reflexes and no motor deficits." (R. 22.) The ALJ also determined that Jannson's mental impairments, "considered singly and in combination, do not meet or medically equal" the listing criteria. (R. 22.) Despite Jannson's problems interacting with others and issues with anger control, he "is in a relationship and lives with his girlfriend" and "treatment notes . . . show that [he] has better control over his anger issues." (R. 22.) The ALJ found that Jannson had mild difficulties with regard to concentration, persistence and pace, and moderate difficulties in daily living and social functioning, but he has experienced no episodes of decompensation for periods of extended duration. (R. 22.)

The ALJ  determined that Jannson has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he can only occasionally use legs for operating foot controls; can never climb ladders, ropes, or scaffolds; can  occasionally climb ramps and stairs; can occasionally balance and crouch; can frequently stoop, kneel or crawl; cannot work around hazards or machinery; requires a sit/stand option to sit for 30 minutes before arising/shifting positions; is limited to performing simple and detailed, but not complex, tasks; can contain sufficient

concentration, pace, and persistence for 2-4 hours; and is limited to brief and superficial contact with co-workers or the public. (R. 23.)

The ALJ found that Jannson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Jannson's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" to the extent they were inconsistent with the ALJ's functional capacity assessment. (R. 24.) The ALJ determined that Jannson's alleged difficulty sleeping was not supported by the objective medical evidence. (R. 24.) The ALJ also found that the medical record contradicted Jannson's allegations of side effects from medication. (R. 24.) The ALJ determined that Jannson's "daily activities . . . detracted from the credibility of his allegations," and cited specific examples from the record that were inconsistent with Jannson's testimony, including: (1) Jannson was able to cook a dinner for 30 people at the Social Connection and complained that he did not have any help with the clean-up; (2) Jannson traveled to Chicago by train 4 times in 2010, a 12-13 hour trip, indicating an ability to sit for longer than the alleged 30 minutes; and (3) Jannson had been able to lose about 50 pounds with exercise at a gym, "discounting his allegation that he was unable to lose weight through exercise." (R. 24-25.)

The ALJ afforded little weight to Odden's opinion because his conclusions "are not consistent with the record as a whole." (R. 25-26.) Odden opined that Jannson would experience a moderate level of difficulty with understanding and remembering detailed tasks and would have moderately limited concentration. (R. 26.) The ALJ noted that Odden "never tested, made any findings, or commented, on [Jannson's] ability to follow

instructions or maintain concentration." (R. 26.) The ALJ gave "some weight to . . . Odden's finding that [Jannson] would have problems working in close proximity to others due to being irritated or angry with others." (R. 26.) The ALJ noted that Odden's treatment notes, however, show that (1) Jannson did not have outbursts towards other people despite being angry; (2) Jannson "had been handing social conflict more appropriately;" and (3) there are no documented episodes of threatening behavior to substantiate Odden's finding. (R. 26.)

The ALJ noted that the above-determined RFC, including preclusion from working around heights or dangerous machinery, "is generally consistent with the opinion from the consultative physical examination." (R. 26.) The ALJ did not, however, accept the limitation against bending, finding that this limitation was inconsistent with the consultative examination and Jannson's daily activities. (R. 26-27.) The ALJ did not afford the RFC assessment from the state agency physician much weight because it did not fully account for Jannson's subjective allegations. (R. 27.) The ALJ gave significant weight to the state agency psychologist's opinion, specifically accepting "that [Jannson] could understand, remember, and carry out simple tasks without special considerations and that [Jannson] could attend to tasks for sufficient periods of time to complete tasks." (R. 27.) The ALJ gave significant weight to Dr. Follingstad's opinion, finding that it is "generally consistent with the medical record" and "adequately reflects limitation on [Jannson's] ability to interact with others." (R. 27.) The ALJ, however, departed from Dr. Follingstad's finding that Jannson "would need extra support and time in any work or social situation," noting that "[d]uring the testing, [Jannson] demonstrated good memory,

CASE 0:13-cv-00104-MJD-TNL Document 18 Filed 02/04/14 Page 18 of 27

abstract reasoning, and background knowledge" and "did not require extra time during the psychological testing." (R. 27.) The ALJ ultimately found Jannson was not disabled and denied his claim. (R. 28-29.)

## III.    ANALYSIS

### A. Standard of Review

Review by this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf*, 3 F.3d at 1213. Rather, the Court "must consider both evidence that supports and evidence that detracts from the [ALJ's] decision" and "may not reverse merely because substantial evidence exists for the

18

opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). If it is possible to reach two inconsistent positions from the evidence, then the court must affirm the ALJ's decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. § 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1520(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

## B.  Substantial Evidence Supports the ALJ's Decision

Plaintiff disputes the ALJ's determination, arguing (1) the ALJ failed to give proper weight to (a) the assessment of Jannson's treating psychologist and (b) the

complete assessment of consulting psychologist Carol Follingstad; and (2) the ALJ's findings are not supported by substantial evidence in the record as a whole.

### 1. Weight Determinations

### a. Jannson's Treating Psychologist Odden

Jannson argues that Social Security Ruling 96-5P requires the ALJ to re-contact the treating source if the ALJ determines the evidence does not support the treating source's opinions. An ALJ, however, is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quotation and citation omitted). Indeed, "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted). "But a lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)) (emphasis in original).

Here, the ALJ determined that Odden's opinion was entitled to little weight because it was not supported by the record as a whole. (R. 26.) Although Odden opined that Jannson would experience moderate difficulty understanding and remembering detailed tasks and would have moderately limited concentration, none of the treatment

20

notes from his multiple sessions with Jannson support this opinion. Odden did not clinically test or comment upon Jannson's ability to follow instructions or maintain concentration throughout his treatment sessions. This portion of Odden's opinion was inconsistent with the consulting psychologist's finding that Jannson *could* perform simple and complex tasks. (*See* R. 516.) Moreover, Odden's notes included no documented outbursts, undercutting his opinion that Jannson would leave employment or become threatening if he received any negative feedback. The ALJ also noted that "[w]hile there are issues with [Jannson] becoming angry or irritated with others, there are no documented episodes of threatening behavior to substantiate" Odden's opinion and that later treatment notes reflected an improvement in Jannson's ability to handle social conflict. (R. 26.) Nothing in the record leads this Court to believe that the ALJ felt "unable to make the assessment he did." *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). The ALJ concluded that Odden's opinion was entitled to lesser weight because "the conclusions expressed in the opinion are not consistent with the record as a whole." The Court finds that substantial evidence supports the ALJ's decision to afford little weight to Odden's opinion.

### b.  Consulting Psychologist Dr. Follingstad

Jannson also argues that the ALJ failed to give appropriate weight to the opinion of consulting psychologist Dr. Follingstad. An ALJ may discount a physician's opinion that is inconsistent with that physician's clinical treatment notes. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). "When there is a conflict in evidence the resolution of that

conflict is usually the duty of the trier of fact, in social-security cases as in others." *Dunlap v. Harris*, 649 F.2d 637, 641 (8th Cir. 1981).

Dr. Follingstad[1] conducted a psychological evaluation of Jannson in July 2010 and opined that he would need extra support and time in any work or social situation. Dr. Follingstad's interview "confirmed that [Jannson] [struggled] with depression, anxiety, and obesity," and she opined that Jannson's reported behaviors "meet criteria for clinical depression and anxiety disorder with panic attacks." (R. 490.) The state agency psychologist, however, opined that Jannson's history and the evidence in his record "do[] not support the presence of limitations severe enough to prevent employment in all work environments." (R. 516.) The state psychologist also opined that Jannson "is able to perform a wide range of activities" and that he "can understand, remember, and carry-out simple tasks without special considerations in many work environments." (R. 516.) In light of these competing opinions—both from non-treating sources—the ALJ evaluated the record and determined Dr. Lovko's opinion to be more credible.

The ALJ considered the record as a whole and found Dr. Follingstad's finding to be entitled to less weight than Lovko's finding. Because neither Dr. Follingstad nor Lovko was Jannson's treating physician, the resolution of any conflict between their opinions is the duty of the trier of fact—in this case, the ALJ. *Dunlap*, 649 F.2d at 641. After reviewing the ALJ's decision and the record as a whole, the Court determines that substantial evidence supports the ALJ's weight determinations.

---

[1] Importantly, Dr. Follingstad was a consulting psychologist. As such, Jannson's argument that Dr. Follingstad's opinion is entitled to controlling weight is inaccurate. *See generally* 20 C.F.R. §§ 404.1527, 416.927.

## 2.  Substantial Evidence Supports the ALJ's Credibility Determination of Jannson's Testimony

Jannson argues that the ALJ failed to conduct a sufficient credibility analysis of Jannson's testimony, and that such a failure is reversible error. "The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Gwalthey v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (citation omitted). When evaluating the credibility of a claimant's subjective complaints, the ALJ

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by the third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. The [ALJ] is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole, but he must give reasons for discrediting the claimant." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (internal quotations and citations omitted). "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

In his decision, the ALJ examined the objective medical evidence of Jannson's physical and psychological impairments and the inconsistencies in his statements and

determined that Jannson's testimony was not entirely credible. He observed that Jannson took multiple 12-13 hour train rides to Chicago over the course of a few months, traveled to Florida by plane, cooked and cleaned up after a dinner for 30 people, and was able to lose weight with exercise. (R. 24-25.) The ALJ discounted the alleged severity of Jannson's symptoms, noting that "[t]he medical evidence demonstrated that [Jannson] had normal range of motion in his extremities" and a "normal gait" and the state agency physician's opinion that Jannson could stand for 2 out of 8 hours. (R. 25.) The ALJ also noted that Jannson's documented weight loss, normal range of motion, and frequent trips are inconsistent with Jannson's earlier statements to his treating physicians. (R. 24-25.) In short, the ALJ faced inconsistencies between Jannson's testimony and the objective medical record as whole and gave specific reasons for discrediting Jannson's testimony. Accordingly, the Court determines that substantial evidence supports the ALJ's credibility determination.

### 3. Substantial Evidence Supports the ALJ's RFC Determination

Jannson also argues that the ALJ's RFC determination is not supported by substantial evidence in the record as a whole. To support this, Jannson argues that the ALJ failed to give appropriate weight to the opinions of Odden and Dr. Follingstad; the ALJ failed to perform a sufficient credibility analysis; and the ALJ improperly omitted the bending restriction from his RFC determination.

As set forth above, the ALJ's decision regarding how much weight to give the opinions of Odden and Dr. Follingstad were supported by substantial evidence, and the ALJ's decision contained a thorough analysis of Jannson's credibility.

Jannson argues that it was improper for the ALJ to omit the bending restriction from his RFC determination. The ALJ's RFC determination did not accept a full bending restriction. (R. 23.) It did, however, contain restrictions on balancing and crouching. *See SSR 85-15, Capability to Do Other Work – the Medical Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, 1985 WL 56857 at *7 (Nov. 30, 1985) (classifying stooping, kneeling, crouching and crawling as "progressively more strenuous forms of bending"). Moreover, Dr. Yohe's evaluation of Jannson was internally inconsistent; Dr. Yohe's notes provide that Jannson could not bend, but his examination diagrams indicate that Jannson could bend 90 degrees. The ALJ also noted that one of Jannson's interests was playing pool, (*see, e.g.*, R. 516, 522), which requires frequent bending at the waist, and as recently as December 2010, Jannson was able to bend over to attempt to lift a pallet. The ALJ is entitled to resolve any inconsistencies in the record in a manner that is supported by substantial evidence in the record as a whole. *Dunlap*, 649 F.2d at 641. Viewing the record as a whole, the Court determines that the ALJ's finding is supported by substantial evidence in the record.

The ALJ considered the record as a whole and found that Jannson was capable of performing sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 426.967(a) with a few restrictions. The record contains sufficient evidence to support this determination. Jannson took a 12-13 hour train ride several times over the course of a few months,

cooked for himself 2-3 times a week, was able to cook and clean up after a meal for 30 people, and a physical evaluation diagram noted that he could bend 90 degrees at the waist. Psychological evaluations noted that Jannson demonstrated good memory, abstract reasoning, and judgment. He was able to understand simple and complex instructions. Whether or not other evidence in the record *could* support a different finding, *see Woolf*, 3 F.3d at 1213, the ALJ's RFC determination is supported by substantial evidence in the record.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, and this action be **DISMISSED WITH PREJUDICE**.


Date:  February 4, 2014                    s/ Tony N. Leung
                                           Tony N. Leung
                                           United States Magistrate Judge
                                           District of Minnesota

                                           *Jannson v. Colvin*
                                           File No. 13-cv-104 (MJD/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or

judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.   Written objections must be filed with the Court before **February 19, 2014.**